If both attorneys that are going to be addressing the court would step up and identify yourselves for the record, please. May it please the Court, Jerry Weintraub for the Appellant, David Epstein, the Public Administrator and Administrator of the Estate of Irene Opalinska. And Joel Brodsky on behalf of the claimant, Loretta Opalinska. Good morning to both of you. Before we begin, I will advise you each that you have approximately 15 minutes in which to present your oral argument. And Mr. Weintraub, from that, you may save out some time for rebuttal. Thank you, Your Honor. You may proceed. Thank you. May it please the Court. In 1983, the Illinois Slayer Statute was amended to eliminate the requirement of a conviction for murder as a predicate for disinheritance under the statute. In 1983, the Illinois Slayer Statute was amended to eliminate the requirement of a conviction for murder as a predicate for disinheritance under the statute. In the related case involving the murder conviction of the son-in-law, Mr. Chabon, and in affirming that conviction, that there was, quote, In the related case involving the murder conviction of the son-in-law, Mr. Chabon, and in affirming that conviction, that there was, quote, paragraph 65 of this Court's opinion, 2013, ILAP 112-588. Now, that statement, we understand that Mr. Chabon has been found guilty of this murder, and he's serving time in the penitentiary, 45 years. But the statute, you say, suggests the amendment somehow suggests that he who has not, he's not named in any will, he's not the taker under any device, that somehow the statute suggests that the language, what language are you directing us to that would suggest that because he made benefit that that precludes his wife from taking? The following language, Your Honor. Statutory language reads, a person who intentionally and unjustifiably causes the death of another shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee, or in any other capacity. Well, this case is not about disinheriting Mr. Chabon. This is about disinheriting the daughter of the victim. So how far, how can we disinherit a daughter in order to prevent the murderer from inheriting? Well, we say for two reasons. One, allowing her to take would be an indirect benefit to her husband, to whom she is still married, according to the record. Well, if a sibling murdered a parent, are we going to disinherit the other siblings? I think that when coupled with the equitable circumstances that the trial court should have considered here, the answer may be yes. If I may continue to answer Justice McBride's question, the statute thing goes on to say, or in any other capacity or any other circumstance. Now, the Fifth District reviewed that language in the estate of Valerius case and said the following. We cannot construe the broad language of the statute in so technical and rigid a fashion that its application violates longstanding public policy or serves to unjustly increase the estate of one who participates in murder. Furthermore, the catch-all words, quote, in any other capacity, end quote, any other circumstance, are intended to apply to unique factual circumstances such as this. I respectfully submit, Your Honor, that this case also presents such unique factual circumstances. Well, in that case, correct me if I'm wrong, two people, two grandsons, actually murdered their grandmother. Correct. And their mother died, and then they were to take under the mother's will, were they not? Yes. All right. So in that case, there's no question that the person, a person, who caused the death of the grandmother shouldn't have received any property. And they were fired from taking indirectly from their mother. Well, that's true, but they were still, they were the person who had intentionally and unjustifiably caused the death. Here, we have a daughter who has not, at least in any way, shape, or form, on this record, or otherwise, has it been suggested that she is a person who intentionally, intentionally rather, caused the death of her mother. You're right. The factual circumstances are not identical, but valerious in a state of muller. We submit, stand for the proposition that Illinois has adopted the indirect benefit test under the Slayer statute. Obviously, we all have questions. If we apply your theory to the valerious case, in that case, rather than trying to disinherit the grandson, you would be trying to disinherit the mother. Is that true? Because the grandkids were the ones who were the murderers. The mother was not a murderer, nor was she convicted of that. I think the answer to that is no. Had the mother survived, she would have been entitled to take because there was no connection shown in the record of her having anything to do with the murder. Well, the statute says cause of murder. So isn't that the same thing that should be applied here, where the daughter, although she may have provided some alibi for the husband or attempted to, she did not cause the death, nor was she ever accused of causing the death of her mother. And so why would you disinherit her? It would be the same thing, valerious, as disinheriting the mother. Because, again, Your Honor, we submit that the valerious case pointed out that intentionally and unjustifiably caused the death must be read broadly to consider the participation of the person sought to be disinherited. I'm trying to get to the point. How broadly are you reading it? If you read it the same way the valerious case read, the mother would be entitled to inherit. And in this case, that would be the daughter standing in the same shoes. How do you read valerious to say that you disinherit the mother? You're trying to take it a step further. I don't. I think they have to be viewed, as the valerious court said, based on the unique facts. And the unique facts here are that here Mrs. Chabon is still married to the murderer. Well, in valerious, the mother was still the mother of the two grandkids. Except she was gone, so the money would then pass directly to the grandkids. But in valerious, the grandkids were, in fact, the murderers, which falls directly within the parameters of the statute. No, they don't fall directly within the parameters of the statute. The means by which they took is different. However, they were the murderers, were they not? They were the murderers. And so they were presumed under the statute to have pre-deceased the decedent. Is that correct? They were the murderers, but they were not the murderer of the person from whom they were taking. But they were in line to take under the laws of inheritance. Is that correct? Correct. But I don't want to beat a dead horse, but getting back to the point I'm making, you said the mother would have been allowed to inherit. I think under that case, had she survived, she would have been allowed to inherit. Well, what's the difference between the standing of the mother in valerious and the daughter in this case? The unity of the marital estate? She's married to the murderer. Well, you can divorce a murderer, but you can't divorce your kids. It seems the bond is stronger in valerious than it is in this case. We think you have to look at all the facts. And it's not only the indirect benefits, it's the application of equitable principles here as well. Well, aren't we going sort of against all general principles of statutory construction with your interpretation? And perhaps these earlier decisions have done that in their interpretation. But aren't you really asking us to go beyond statutory principles to say that because the murderer may possibly take some form of a benefit that we should disallow his wife from inheriting? When the statute is directed at A, we have to look at every word. It says a person who intentionally and unjustifiably causes shall not receive. But it doesn't ever suggest that anyone else or other persons shall not take. It's specifically directed at one individual, a person causing the death. So you're asking us, I mean, I see where the suggestion about indirect comes from all these other descriptions here, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee. But at the same time, the statute is directed at prohibiting the actual slayer from taking. I don't think it suggests that a relative in any way, shape, or form that has nothing to do with the commission of that murder should be disinherited. And that's really what you're asking us to do is to go beyond the statutory confines and suggest that this applies to another person. Whereas this statute, its focus is a person who intentionally. So I do think there is a limit to this indirectness. And that is it still has to be directed to the person who committed the murder. We know they cannot take. Your Honor, I agree that with respect to the indirect benefit analysis, the focus is on the murderer, Mr. Chabot. And we respectfully submit that a reasonable reading of the statutory language is broad enough, as the Fifth District has read it, and I think as Justice Posner has construed it, applying Illinois law in a diversity case in AFMA. We're not bound by that, though, are we? I understand. And he didn't like it either, did he? He didn't like it either, did he? I mean, they kind of... Well, since Illinois has adopted the indirect benefit... But they question the propriety of Illinois having done so, don't they? I don't think he questioned the propriety. He said that the Court has adopted it. And again, when you look at focusing on the murderer, shall not take in any other capacity. He's the spouse. But what evidence in the record is there that he's taken anything under any circumstance? There isn't. And our position should be that there should have been... The language shouldn't have been limited, as the trial court did, to a strict reading of the statute, and the trial court should consider both indirect benefit and equitable circumstances. Where is the evidence of indirect benefit? Where is there any evidence that he's going to indirectly benefit? He's in jail. He's doing 45 years. Well, there are other cases, and it's not in this record, where, for example, some of the money inherited has been used to pay for defense fees and legal fees. Couldn't you seek an injunction to stop that as opposed to trying to come in under the... If you became aware that there was a benefit being bestowed, couldn't you seek an injunction? I think it's frankly... I'm just saying there might be a remedy outside the statute, but we're looking at the statute, and that's what we have to base our decision on. Under the time frame that we're dealing with now, since he's already convicted, his appeal has been confirmed, I think that's not any longer possible. The second factor that we say the trial court should have considered is the application of principles of equity in probate. It is now clear, if it was not before, in view of the Illinois Supreme Court's decision in DeHart v. DeHart, that equitable principles apply in probate in the context of inheritance issues. That was an adoption case, was it not, counsel? Equitable adoption. The Supreme Court recognized the principle of equitable adoption, including someone as an heir when they weren't legally entitled to be so included. But not seeking to preclude inheritance. No, but, Your Honor, as we pointed out, whenever you equitably include someone, that has the concomitant effect of equitably disinheriting the other heirs by either diluting what they would take or trumping their interest. But not defeating in its entirety. Well, it could defeat another heir. But not necessarily. But it could. It depends on the chain of heirship. The point is, though, that it's pretty much undisputable now that equitable principles apply for the purposes of considering who should inherit. Well, if equitable principles apply here under the unique factual circumstances that are in this record, clearly here you have, and not focusing as with indirect benefits on the murderer, but on the person who seeks to inherit. Clearly she has unclean hands. The record establishes in both the Chabon opinion and the Pryor-Opolinska opinion that she lied to the police when she told them she was not in the apartment on the day of the murder. She lied in a written statement that she gave to the assistant state's attorney. She testified falsely before a grand jury. So you're really asking us to now include within the statute a person with unclean hands, regardless of whether they've intentionally or unjustifiably caused the death of another. Because wasn't her conduct all related to post-homicide, after the death? Her conviction was related to post-homicide. Her conduct. Well, didn't her conduct come into play after the death of her mother? Starting with when she lied to the police on the day of the discovery of the body. Right. But the statute, again, clearly is focusing on the A person who unjustifiably causes the death. And now you're kind of switching the focus over to her, as opposed to, isn't it Chabon that you want to prevent from taking? And so this indirect taking, now you're sort of suggesting, well, she shouldn't take either. Let me be clear, Your Honor. I want to prevent, and I think it's the position of our office, that we want to prevent anybody who's even thinking about participating in something like this from having any involvement. I think that's the public policy here. I think the public policy is spoken in the language that a person who intentionally and unjustifiably causes the death shall not receive any property. I don't think that this language suggests anything more than that. Now, her conviction and the conviction of her husband do not suggest that she participated or intentionally or unjustifiably caused that death. Do they? I mean, unclean hands is one thing, but that's not what the statute says, and there's nothing in here that I think suggests we bring equity here. There are some maxims we could probably come up with that would suggest that a person that hasn't had anything to do with the death shouldn't be disinherited. There's nothing in the record indicating that she directly participated other than the evidence that she was in the apartment on the day of the murder and answered at least two incoming phone calls at approximately 1.30 and 3 o'clock on the day of the murder and then engaged in a pattern of lying to the various authorities about her having been there and did it in order to, as the court found, send the police on a wild goose chase. But if Your Honor were to accept that strict construction, then the question becomes what about this cooperation mandate in the Illinois Slayer Statute, which is not part of the Uniform Probate Act formulation and is not part of most other states' Slayer Statutes and requires the holder of any property subject to the provisions of this section, and clearly that's Dorota, the daughter here. Counsel, if the legislature, and we presume that they were, were careful enough to provide the language about which you speak on the issue of cooperation or not cooperating, don't you think that in writing this statute if they thought they should also, that that individual should also have been disinherited, that they would have included language right there? Obviously they contemplated this particular scenario or that there might be an instance where someone might not cooperate and have information, but they don't go any further to say that they also should be disinherited. Look, if you read it that way, then the language is nugatory. If it has no consequences, if it's not intended to result in any kind of consideration, then it's entirely nugatory, which would also violate a cardinal principle of statutory instruction. We think this is one factor that the trial court also ought to consider, and frankly, I don't think one will ever find a case where the violation of the cooperation mandate is more clearly established. Here, she's been convicted of not cooperating, of perjury and obstruction of justice. Well, who's required to cooperate? The holder of any property? Yes. Does that mean the bank? Does that mean a trustee? Yes. Is she a bank or trustee in this case? No, but she's the holder of the condominium and all the other property of the deceased. She falls within it. So we think all three of those factors should have been considered by the trial court, and the trial court should have reached the determination, not based strictly on the language of the clause, intentionally and unjustifiably caused the death. We think the statute can be fairly read to be broader, that the indirect benefit theory, which focuses on Mr. Chaban, the equitable principles, and the violation of the cooperation mandate, which focused on the daughter of Derota, all of those should have been considered. We think that, and the courts have said, there is a strong public policy that murderers should be denied the fruits of their crime, the Valerius case, and that, frankly, to stand by, to be in the room while your husband murders your mother, so that you may take, is exactly within the scope. Counsel, you know, I think that if there were information or suggestions like that in the record, we might be discussing this quite differently, but you've kind of added something here now that's not in the record. We know she was in the apartment. Well, you know that she was in the apartment that day. Correct. There is no information in the record to suggest the scenario you're describing. You're right, Your Honor. All right. Thank you very much. All right. Thank you. And you will have some time for rebuttal. Thank you. Mr. Brodsky. Good morning. Good morning, Justice McBride. May it please the Court, I'm obviously especially a little bit nervous today because the students from my alma mater are being present, so I have to try to do a very good job. We'll start with these last provisions. When Mr. Weintraub was talking about the statute, he directs us to the two provisions, the holder of any property shall not be liable for distributing or releasing said property, but then he references the very last paragraph. If the holder of any property subject to the provisions of the section knows or has reasons to know that a potential beneficiary caused the death of a person within the scope of the section, the holder shall fully cooperate with the law enforcement. Then he says this has no meaning if we don't incorporate it equitably into the statute. How do you respond to that? Well, first of all, in general, as you're pointing out, there's nothing written in this section that applies any penalty for violating it. But second of all, in the facts of this case, there is nothing that says that Ms. Chapman was a holder of any property, nor her husband was the holder of any property, nor that her husband, the person that did the murder. What about the condominium? They moved into it right away, so obviously they were in her property. That was after her death, that's true. Yes. But that was much after the statements of the state's attorney and the statements. Which is another reason I want to get back to the issue of the facts as laid out in these two Rule 23 opinions. My client obviously was not a party to the murder conviction of her husband and had no control over the facts. And even to say that she was in the apartment on the date of the murder, even if you look at the facts, that's what's laid out in the opinion, is not truly accurate. The mother's body was found on July 18th. The coroner testified that in paragraph 20, according to the opinion in the murder case of Mr. William Shade, paragraph 23 at the bottom, that from the state of decomposition, that looked like probably more than 24 hours. So a day, let's even go two days. The body is found on the 18th. She is in the apartment on the 15th. According to the coroner, the murder took place on either the 16th or 17th. So I don't see anything in this, even if you look at the Rule 23 facts on the opinion, anything to place her anywhere near the condominium on the date that her mother was murdered, according to the testimony of the coroner that's reported in the appellate court opinion. Don't the two appellate decisions from outside, one is outside this district and one is a first district case, don't they suggest there is this kind of indirect benefit approach that should be taken? Oh, I've asked for the indirect benefit approach. Absolutely, they do. Can it reasonably be inferred? He's her husband, so he indirectly benefits. No. Why not? Well, first of all, the Zielinski, you're talking about the Zielinski case and the — Valerius. Valerius case. Yes. As to Zielinski, the facts in Zielinski were that the fact that the proceeds were going to go to the murderers but pass through the mother's estate, that passing through the mother's estate does not wash the money clean. That's all it really says. That the murderers can inherit directly or indirectly. The person that caused the death cannot benefit directly or indirectly. And just because of the legal nicety of the money passing through somebody else's estate doesn't change that circumstance. It doesn't wash it clean. The case that makes it a little bit more, I guess, as far as the appellate courts have ever gone is in the Zielinski case. And that talks about unique facts where the mother was a co-conspirator with a murderer who murdered her husband. She only got 10 years for that. And by — and I don't know if she got out really quickly or if the probates courts move slowly, but she was out when the estate was being probated. And by that time, she was the legal guardian of her two minor children. And the court said, as legal guardian of the two minor children, you're going to have complete and unfettered access to the money coming from your husband's estate. And on these — and the appellate court uses the words unique facts. Are these facts unique? Are the facts in our case? Yes. No. You have a wife who has been convicted of obstructing justice, all directly related to the death of her own mother. Right. And her husband has been found guilty of that murder. And she's still married to him. And the — one of the arguments is, is that he clearly could benefit from this fact and that there actually was some benefit earlier when they took up residence in this home. Well, the facts are not as unique as in Zielinski. Because in Zielinski, it was the murderer, the wife who had hired the person who actually did the killing, who was involved in intentionally causing the murder of her husband, who was actually going to lay her hands on the money, who was going to have unfettered control of the entire estate from the husband if it went through. In this case, all we know is that my client, Ms. Opelinski, Ms. Dorota, is going to have her hands on the money. There is absolutely no evidence in the record that her husband is going to benefit or get his hands on $1 of this money. Now, if you look at what is — the facts that are actually in the record, and they are spelled out in what we call the clarified order, that the order of November 7, 2014, which is the order that lays everything out, it's attached to the brief of the appellant, I believe was his Exhibit B. Yes, A-12. If you look at that, the facts that are in the record that the court had to work on were these. The acts that Dorota was convicted of occurred after her mother's murder. Dorota remained married to Mr. Chabin. Mr. Chabin was at that time 40 and was serving 45 years in prison, for which 100% of the time must be served, and he won't get out if he lives so long until he's 82. That Mr. Chabin's conviction was affirmed and the petition for legal appeal from the Supreme Court was denied. And then it goes on, that order, to say the movement, the public administrator, has a burden of proof and he declined to present additional evidence. So that is the entire universe of the evidence that was before the court. Nothing else. There is nothing in this record that was before the court and the public administrator had the opportunity to introduce whatever evidence he chose to and he chose not to present any more evidence, that Mr. Chabin, the person who caused the death, directly caused the death, intentionally and unjustifiably, of Mrs. Olpilinsky, was going to lay his hands on $1, not for money for his canteen to get sacks, nothing. There's not one piece of evidence. If there was, that he actually was going to lay his hands on some of this money, I guess then the court could have made this type of decision as I think the appellate court did, or the Seventh Circuit did, in the Prudential v. Alzheimer case, where they said that any benefit, if all, to the person that caused the death in that case, would have been de minimis at best. Well, let's just veer off momentarily to the doctrine of unclean hands. And let's assume, for purposes of this case, that Derota has unclean hands. How do you respond to the opposing counsel's suggestion that therefore the husband is going to indirectly benefit, and there's no question that Derota herself has these unclean hands? Well, if unclean hands, if the Illinois legislature wanted unclean hands to be a part of the Slayer statute, it clearly could have made it. Because since 1983, they've adopted section 2-6.2 of the probate code, disinheriting people who are convicted of financial exploitation. They've adopted 2-6.5, disinheriting people who are guilty of willful neglect of a child. They've adopted section 2-6.6, disinheriting people who have been convicted of abuse or neglected a nursing home. They've adopted section 12.19 of the criminal code, chapter 725, disinheriting people guilty of criminal abuse or neglect of an elderly or disabled. And they've adopted section 12-21 of the criminal code, disinheriting financial exploitation of elderly or disabled. And then even one more, section 17.56 of the criminal code, disinheriting people who are proved by the punishment of the evidence to have been guilty of financial exploitation. So the legislature is very, very able to disinherit people for the actions that they deem they should be disinherited for. And they've done it six times since the Slayer statute was adopted, but they haven't amended the Slayer statute. Well, counsel refers to the language that they cannot take in various ways, whether heir, legatee, beneficiary, joint tenant, or in any other capacity. Correct. Well, once again, you have to go back to the beginning of the sentence where it talks about a person who has intensely unjustified and unjustifiably caused the death of another shall not take it in any way, shape, or form. And I certainly agree with that public policy that anybody who has intentionally and unjustifiably caused a death shouldn't be able to adhere to some sort of constructive legal nicety or legal construction, no matter how they do it, because that would be a dangerous precedent. But for someone who hasn't intentionally and unjustifiably caused the death of another, if the legislature wanted to expand beyond that, they would say so. They would amend the law to say, someone who has intentionally and unjustifiably caused the death of another or has before or after the death aided a person in causing the death or in trying to escape from consequences of the murder cannot inherit, they could do so. But they didn't. And I have to believe that if they find six different other reasons to do it and they don't amend the code, then they don't intend that to happen. And I think we've been, the Supreme Court, I noted in my brief, talked about judicial legislating in a recent case, and that's the Harris v. One Hope case. And I don't, I think that we have to go by what the will of the legislature is as far as the wording of the statute where it's clear. Any other things you want to? Well, just briefly. Just to sum up. Yes. Very briefly. I believe that one thing that we did talk about, I mean very briefly but touched upon, is when you have a, when there is a Rule 23 decision by the appellate court and there's facts laid out in that Rule 23 decision, how can those facts be used in a case where the party is not, it's not res judicata or any of the other reasons that a Rule 23 decision can be used. And I think that the fact, the reason that Rule 23 decisions are made are just for that reason that people shouldn't, people outside of the case, except for the very narrow reasons cited in Rule 23, shouldn't be able to refer to either the facts or the law in that case as support for anything. And that leaves us nearly with what was in the record in that court order of clarified order of November 7, 2014. And based on that record and based on the fact that there is no other evidence before either the trial court or this court that my client is not disinherited   The fact that I am disinherited in the case I am disinherited in the court order, I am disinherited in the court order, and I am disinherited in any other court order through the SLAR statute and the opinion of the judge in the trial court should be affirmed. Thank you very much. All right, Mr. Brodsky, thank you. Mr. Weintraub. With respect to Mr. Brodsky's last point, what is in this record is a certified copy of Dorota's conviction, a certified copy of Mr. Chabon's conviction. The opinion affirming Mr. Chabon's conviction was published. The opinion affirming Dorota's conviction was a Rule 23 opinion. However, it is in large part in the record. It is also factually consistent with the facts found in the Chabon opinion, which was published, but it was quoted at great length at record pages 254. Didn't both of you refer to that before the proceedings in the trial court? Yes. It's in our petition to disinherit pages 254 to 255. Do you have any other response to the objection to your citing that Rule 23 here? No. No, you don't think any exception? Do I have an objection here? Yes. I think it's not cited as precedent, so it's therefore not within the scope of his objection under Rule 23. And frankly, I think it's also within the scope of collateral estoppel, because the powers are the same. It was the people versus her, and effectively it's the people versus her here, and I don't think she can take that. And the rule permits that? Yes. It is being cited for collateral estoppel purposes? Correct. All right. Anything further you want to tell us? Our ultimate position is the real question here is whether to consider these three factors, indirect benefit, equitable principles, and the cooperation mandate, and that's for the trial court. And the trial court should have been permitted or should have considered these factors. I don't want to prejudge how they would find this case, but the issue is the scope of what should be considered. So we're respectfully requesting the manner be remanded with instructions for the court to consider this, because that's the appropriate form to make this decision. And whether it's sufficiently likely that Mr. Shaban will take through his wife is ultimately for the trial court to determine. So we're respectfully requesting that the court reverse and remand. How would the trial court determine? I mean, what would be available to the trial court to determine whether Mr. Shaban will take? Well, we'll certainly ask Mrs. Shaban whether she's in any way supported her husband or her legal defense or in any way contributed any monies to him. And if the answers are no? Well, that's for the trial court to decide. But if the answers are no? If the trial court decides there is no indirect benefit here, then the answer is no. But that's for the trial court. But frankly, I think when I look at him moving into the condo shortly after the murder, I think that's enough for the trial court to decide there was indirect benefit. I don't want to argue the facts, but frankly, the record shows that she left work on the afternoon of Friday, June 25th, and one of her co-workers started calling her that evening at approximately 8 o'clock. And there was no further communication. And also that that co-worker was supposed to have dinner with her the following night, was never able to get a hold of her the following day, and didn't show up. And we are familiar with the facts. Right. I understand. And that's in both the unpublished and the published decision. Thank you very much, Your Honor. All right. Thank you both. The case is well argued, well briefed, and we will take it under advisement. And the court will stand in recess.